UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SAM WIETSCHNER & TOVA WIETSCHNER TRS FOR SAM WIETSCHNER PENSION PLAN UA APRIL 1, 1990, Individually and on Behalf of All Others Similarly Situated, | § § § § § § | |
| Plaintiff, | § § | Civil Action No. 4:15-cv-2423 |
| v. | § § | JURY TRIAL DEMAND |
| EMMANUEL T. BALLASES, LYDIA I. BEEBE, FRANK J. BRAMANTI, WALTER M. DUER, BARBARA J. DUGANIER, JAMES C. FLAGG, JOHN N. MOLBECK, JR., SUSAN RIVERA, HANS D. ROHLF, ROBERT A. ROSHOLT, J. MIKESELL THOMAS, CHRISTOPHER J.B. WILLIAMS, HCC INSURANCE HOLDINGS, INC., TOKIO MARINE HOLDINGS, INC., TOKIO MARINE & NICHIDO FIRE INSURANCE CO., LTD., and TMGC INVESTMENT INC., | § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

**CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**

Plaintiff Sam Wietschner & Tova Wietschner TRS for Sam Wietschner Pension Plan UA April 1, 1990, ("Plaintiff"), by its attorneys, alleges the following upon information and belief, except for those allegations that pertain to Plaintiff and its attorneys, which allegations are based on personal knowledge. Plaintiff's information and belief is based on, *inter alia*, the investigation conducted by Plaintiff's attorneys, including a review of the public filings of Defendant HCC Insurance Holdings, Inc. ("HCC" or the "Company"), press releases, news articles and publicly available information concerning HCC:

## SUMMARY OF THE ALLEGATIONS

1.     This is a stockholder class action brought by Plaintiff, individually and on behalf of HCC's public shareholders against the HCC Board of Directors (the "Board"), in connection with the sale of HCC to Tokio Marine Holdings, Inc. ("Tokio Marine" or "Parent") and TMGC Investment Inc., ("Merger Sub").  Plaintiff seeks to enjoin the sale of the Company to Tokio Marine and Merger Sub as detailed herein pursuant to the Agreement and Plan of Merger (the "Merger Agreement").

2.     Plaintiff alleges that the sale of HCC to Tokio Marine as contemplated by the Merger Agreement is unfair and inequitable to the HCC public stockholders and constitutes a breach of the fiduciary duties of the directors in the sale of HCC.

3.     Pursuant to the Merger Agreement, HCC shareholders will receive $78 in cash per share, through Tokio Marine's wholly-owned subsidiary, Tokio Marine & Nichido Fire Insurance Co., Ltd. ("TMNF").  Upon completion of the Merger Agreement, Tokio Marine will own all the outstanding shares of HCC (the "Proposed Merger").

4.     In order to consummate the Proposed Merger, HCC requires the approval of its shareholders and on July 13, 2015, issued a Preliminary Schedule 14A Proxy Statement (the "Preliminary Proxy"), to which HCC has referred its shareholders, announcing a vote for that purpose.

5.     The Proposed Merger is subject to customary closing conditions, including approval of at least a majority of the outstanding shares of HCC common stock and is expected to close in the fourth quarter of 2015.

6.      The Preliminary Proxy is false and misleading and omits material information necessary for shareholders of HCC to make an informed decision regarding the Proposed Merger.

7.      The Proposed Merger is unfair to HCC shareholders because it does not adequately value the Company's future growth prospects, which will inure to Tokio Marine if the Proposed Merger is consummated.  Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Merger with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, Defendants agreed to: (i) a provision that requires the Company to pay Tokio Marine a termination fee of $187,500,000; (ii) a no-solicitation provision that prevents other buyers from having access to the Company's confidential information, which information is necessary to formulate a bid; (iii) a "no-shop" provision prohibiting the Company from actively soliciting potential bidders; and (iv) an agreement to promptly (within two business days) notify Tokio Marine of any other Takeover Proposal from a third party to HCC.  These provisions substantially limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of HCC.

8.      As detailed herein, the Preliminary Proxy's cursory description of the process by which the deal was negotiated is wholly insufficient.  The Preliminary Proxy fails to disclose material information regarding the sales process that the Board used to enter into the Merger Agreement as well as Goldman Sachs & Co.'s ("Goldman Sachs") financial analyses.  Because the Preliminary Proxy conceals material information concerning both the process and financial content of the Proposed Merger, Plaintiff and the other shareholders of the Company have suffered and will suffer irreparable injury unless Defendants are enjoined from breaching their

fiduciary duties and from carrying out the aforesaid plan and scheme.  Plaintiff seeks to enjoin Defendants from approving the Proposed Merger or, in the even the Proposed Merger is consummated, recover damages resulting from Defendants' violations of their fiduciary duties of loyalty, good faith and due care.

## JURISDICTION AND VENUE

9.     Jurisdiction is founded upon federal question jurisdiction, pursuant to § 14(a) of the Exchange Act of 1934, as amended, 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, of the SEC regulations promulgated thereunder, Schedule 14A, 26 C.F.R. § 240.14a-101.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because HCC maintains offices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.  Moreover, each of the Individual Defendants as Company officers and/or directors has extensive contacts within this District.

## PARTIES

11.     Plaintiff has been a holder of HCC common stock since prior to the transaction herein complained of and continues to hold HCC common stock as of this date.

12.     Defendant HCC is a corporation duly organized and existing under the laws of Delaware with its principle places of business located at 13403 Northwest Freeway, Houston, Texas, 77404-6094.  HCC underwrites non-correlated specialty insurance products worldwide. The Company operates in five segments: U.S. Property & Casualty, Professional Liability, Accident & Health, U.S. Surety & Credit, and International.  The Company markets its products directly to consumers, as well as through a network of independent agents and brokers, and managing general agents.  HCC was founded in 1974 and is headquartered in Houston, Texas.

The Company is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "HCC."  As of March 31, 2015, HCC had total assets of $11 billion, shareholders' equity of $3.9 billion and approximately 2,500 employees.  HCC's major domestic and international insurance companies have financial strength ratings of "AA (Very Strong)" from Standard & Poor's Financial Services LC and "A+ (Superior)" from A.M. Best Company, Inc.

13.     Defendant Emmanuel T. Ballases ("Ballases") has been a member of the Board since 2012 and currently is the Chairperson of the Compensation Committee as well as a member of the Nominating and Corporate Governance Committee.

14.     Defendant Lydia I. Beebe ("Beebe") has been a member of the Board since March 5, 2015, and currently is a member of the Compensation and Nominating and Corporate Governance Committees.

15.     Defendant Frank J. Bramanti ("Bramanti") has been a member of the Board since 1997 and currently is the Chairperson of the Enterprise Risk Oversight Committee as well as a member of the Investment and Finance Committee.  Defendant Bramanti previously held several executive positions with the Company, including as its Chief Executive Officer ("CEO"), Executive Vice President, Secretary, Chief Financial Officer ("CFO") and Interim President.

16.     Defendant Walter M. Duer ("Duer") has been a member of the Board since 2004 and is a member of the Audit and Enterprise Risk Oversight Committees.

17.     Defendant Barbara J. Duganier ("Duganier") has been a member of the Board since 2015.

18.     Defendant James C. Flagg ("Flagg") has been a member of the Board since 2001 and currently is the Chairperson of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

19.     Defendant John N. Molbeck, Jr. ("Molbeck") has been a member of the Board since 2005 and currently is a member of the Investment and Finance as well as the Enterprise Risk Oversight Committees.  Defendant Molbeck previously held the positions of President and Chief Operating Officer ("COO") at HCC.

20.     Defendant Susan Rivera ("Rivera") has been a member of the Board since 2014 and currently is a member of the Audit, Compensation and Enterprise Risk Oversight Committees.

21.     Defendant Hans D. Rohlf ("Rohlf") has been a member of the Board since 2013 and currently is a member of the Compensation and Enterprise Risk Oversight Committees.

22.     Defendant Robert A. Rosholt ("Rosholt") has been a member of the Board since 2008 and currently is the Chairman of the Board.  Defendant Rosholt also is a member of the Investment and Finance Committee and Nominating and Corporate Governance Committee.

23.     Defendant J. Mikesell Thomas ("Thomas") has been a member of the Board since 2012 and currently is the Chairperson of the Investment and Finance Committee as well as a member of the Audit Committee.

24.     Defendant Christopher J.B. Williams ("Williams") has been a member of the Board since 2007 and has been the Company's CEO since December 2012.  Defendant Williams formerly was the Company's President and Chairman of the Board.  Defendant Williams currently is a member of the Enterprise Risk Oversight Committee as well as the Investment and Finance Committee.

25.     Defendants in ¶¶ 13 to 24 constitute the Board of HCC (the "Individual Defendants") and, by reason of their corporate directorships and/or executive positions, stand in a fiduciary position relative to the Company's public shareholders.  Their fiduciary duties, at all

times relevant herein, required them to exercise their best judgment, and to act in a prudent manner, and in the best interests of the Company's public shareholders. The Individual Defendants owe the public shareholders of HCC the highest duty of good faith, fair dealing, due care, loyalty, and full candid and adequate disclosure.

26.     Defendant Tokio Marine Holdings, Inc ("Tokio Marine" or "Parent") was established in 1879 in Japan and is the insurance holding company for Tokio Marine Group. Tokio Marine Group undertakes Domestic Non-Life Insurance, Domestic Life Insurance, International business and Financial and General businesses.

27.     Defendant TMGC Investment Inc. ("Merger Sub") is a Delaware corporation and an indirect wholly-owned subsidiary of Tokio Marine, created to effectuate the Proposed Merger.

28.     Defendant Tokio Marine & Nichido Fire Insurance Co., Ltd. ("TMNF") is a Japanese corporation founded in 1879 and is the oldest and largest property and casualty insurer in Japan. TMNF conducts business in the United States through its U.S. subsidiaries.

29.     Collectively, HCC, Tokio Marine, Merger Sub and TMNF are referred to herein as "Defendants."

30.     Each Defendant herein is sued individually or as a conspirator or aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## DEFENDANTS' FIDUCIARY DUTIES

31.     The officers and directors are deemed to stand in a fiduciary relation to the Company and its shareholders, and must discharge the duties of their respective positions in

good faith, and with that diligence, care, judgment and skill, which ordinary prudent men would exercise under similar circumstances.

32.     As part of these fiduciary duties, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control; or (ii) a breakup of the corporation's assets, the directors have an affirmative fiduciary obligation to act in a manner consistent with the best interests of the Company's shareholders, including the shareholders' interest in obtaining the highest value reasonably available in a change of corporate control transaction.   To diligently comply with these duties, the directors and/or officers may not take any action that:

> a.     adversely affects the Company's value;
>
> b.     will discourage or inhibit alternative offers to purchase control of the Company or its assets;
>
> c.     contractually prohibits themselves from complying with their fiduciary duties;
>
> d.     is not adequately informed or considered;
>
> e.     will otherwise adversely affect their duty to act in a manner consistent with the interests of the Company and its shareholders, including their interests in securing the best value reasonably available under the circumstances for the Company; and
>
> f.     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

33.     In accordance with their duties of loyalty and good faith, Defendants, as directors and/or officers of HCC, are obligated under applicable law to refrain from:

      a.      participating in any transaction where the directors' or officers' loyalties are divided;

      b.      participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared at the Company's expense;

      c.      unjustly enriching themselves at the expense or to the detriment of the Company, or permitting other officers or directors to do so;

      d.      structuring a sales process for the Company to favor directors, officers or other Company insiders for reasons unrelated to and/or conflicting with the directors' duty to seek the best price available for the Company;

      e.      making ill-informed decisions harming the interest of the Company or its shareholders; and/or

      f.      failing to disclose and/or misrepresenting material information about the Company, the sales process for the Company and the Company's financial prospects going forward when seeking shareholder support of a merger transaction.

34.     Plaintiff alleges herein that Defendants, in connection with the Proposed Merger, are knowingly and recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to HCC, Plaintiff and the other public shareholders of HCC. Specifically, among other things, the Individual Defendants have:

      a.      engaged in a woefully deficient process in soliciting and consummating the Proposed Merger and Merger Agreement;

      b.      accepted Merger Consideration that significantly undervalues the Company and fails to take into account the Company's growth potential and likely future success, thereby denying HCC and the Company's public shareholders the opportunity to receive fair and adequate value for the Company in the Proposed Merger; and

      c.      chosen not to provide shareholders with all information necessary to make an informed decision in connection with the Proposed Merger.

35.     By virtue of their positions as directors and/or officers of HCC, and/or their exercise of control and ownership over the business and corporate affairs of HCC, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause HCC to engage in the practices complained of herein.  Each Defendant herein is sued individually and in his or her capacity as a director of HCC and/or as an aider and abettor.  The liability of each Defendants arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes or transactions complained of herein.

36.     Because Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Merger, the burden of proving the inherent or entire fairness of the Proposed Merger, including all aspects of its negotiation structure, price and terms, is placed upon Defendants as a matter of law.

**CLASS ACTION ALLEGATIONS**

37.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 on behalf of all holders of HCC shares who are being and will be harmed by Defendants' actions described below ("Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

38.     This action is properly maintainable as a class action because:

a.      The Class is so numerous that joinder of all members is impracticable. The Company's Preliminary Proxy, filed with the SEC on July 13, 2015, indicates that as of that date, there were 95,644,299 shares of Common HCC Stock issued and outstanding.  The actual number of stockholders of HCC will be ascertained through discovery.

b.      There are questions of law and fact that are common to the Class, including:

    i.   whether Defendants misrepresented and omitted material facts in connection with the Proposed Merger;

    ii.  whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Merger; and

    iii. whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Merger complained of herein consummated.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to

individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class.

e.       Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

39.     HCC was founded in 1974 and is headquartered in Houston, Texas.  The Company is a world leading specialty insurer with offices in the United States, the United Kingdom, Spain and Ireland.  HCC's common stock is listed on the New York Stock Exchange under the symbol "HCC."

40.     The Company underwrites over 100 classes of specialty insurance products in approximately 180 countries through its five insurance underwriting segments: U.S. Property & Casualty, Professional Liability, Accident & Health, U.S. Surety & Credit and International.

41.     HCC has continued to grow its business through the acquisitions of other insurance companies and underwriting agencies, having acquired 50 such companies since HCC went public in 1992.  The Company recently expanded its business by acquiring all of the capital stock of Producers Ag Insurance Group, Inc. ("ProAg") from CUNA Mutual Group for $104.5 million in cash.  The acquisition of ProAg allowed HCC to increase its portfolio and enter the crop insurance business by adding the successful ProAg insurance company.  Currently, ProAg is the seventh largest multi-peril crop company in the United States, with over $550 million in gross premium in 2014.

**The Company's Success and Potential for Growth**

42.     As of March 31, 2015, HCC had total assets of $11 billion, shareholders' equity of $3.9 billion and approximately 2,500 employees.  HCC's major domestic and international insurance companies have financial strength ratings of "AA (Very Strong)" from Standard & Poor's Financial Services LLC and "A+ (Superior)" from A.M. Best Company, Inc.  HCC transacts business in approximately 180 countries and underwrites more than 100 classes of specialty insurance

43.     The Company has produced excellent financial results and strong growth for the past few years.  Currently, HCC is a world leader specialty insurer, transacting business worldwide.  For the trailing twelve months, as of June 30, 2015, HCC has revenue of $2.74 billion.

44.     In April 28, 2015, HCC announced its results for its first quarter ended March 31, 2015, entitled "HCC Insurance Holdings Reports Record First Quarter Net Earnings and Earnings Per Share."  The announcement stated, in pertinent part:

> **Highlights:**
>
> - **Net earnings of $112.9 million, or $1.17 per diluted share**
> - **GAAP combined ratio of 86.5%**
> - **Gross written premium increased 11% to $826.1 million**
> - **Net written premium increased 13% to $668.9 million**
> - **Annualized return on equity of 11.5% and operating return on equity of 9.9%**
> - **Book value per share increased to $41.03**
>
> HOUSTON (April 28, 2015)…
> **HCC Insurance Holdings, Inc. (NYSE: HCC)** today released results for its first quarter ended March 31, 2015.
>
> Net earnings were $112.9 million, or $1.17 per diluted share, in the first quarter of 2015, compared to $107.9 million, or $1.07 per diluted share, in the same quarter of 2014.

The Company's consolidated results for the first quarter of 2015 include the results of Producers Ag Insurance Group, Inc. (ProAg), which HCC acquired effective January 1, 2015 for $104.5 million. ProAg contributed $72.6 million, $54.7 million and $17.0 million of gross written, net written and net earned premium, respectively, to consolidated premium. Including transaction costs, ProAg's operations generated a loss of $7.7 million, or $0.08 per share. The majority of this loss relates to the seasonal nature of the crop insurance business. The loss increased the Company's first quarter 2015 consolidated loss ratio, expense ratio and combined ratio by 0.8, 1.1 and 1.9 percentage points, respectively.

The Company's combined ratio was 86.5% for the first quarter of 2015 (84.6% excluding ProAg), compared to 83.4% for the same quarter of 2014. The net paid loss ratio was 64.7% for both quarters. HCC had no reserve development in either the first quarter of 2015 or 2014.

First quarter 2015 net earnings benefited from the Company's assertion to permanently reinvest accumulated undistributed earnings of the Company's controlled foreign corporations for 2014 and prior years. With this assertion, deferred taxes on these earnings, which had previously been booked at the U.S. tax rate of 35%, were adjusted to the U.K. tax rate of 20%. This assertion resulted in reduced tax expense of $5.9 million in the first quarter of 2015.

Gross written premium increased 11% to $826.1 million (or 1% to $753.5 million excluding ProAg) in the first quarter of 2015, compared to $746.7 million in the same quarter of 2014. Net written premium increased 13% to $668.9 million (or 4% to $614.2 million excluding ProAg) versus $590.2 million in the respective quarters. Net earned premium increased 7% to $600.6 million (or 4% to $583.6 million excluding ProAg) in the first quarter of 2015, compared to $562.6 million in the same quarter of 2014.

Investment income was $53.5 million in the first quarter of 2015, compared to $56.8 million in the same quarter of 2014. As of March 31, 2015, HCC's fixed maturity securities portfolio had an average rating of AA, a duration of 4.7 years and an average long-term tax equivalent yield of 4.1%.

HCC generated cash flow from operations of $31.1 million in the first quarter of 2015, compared to $95.5 million in the same quarter of 2014. At March 31, 2015, the Company had $418.6 million of cash and short-term investments and $230.1 million of available capacity under its $825.0 million revolving loan facility.

The Company purchased 1.0 million shares of its common stock during the first quarter of 2015 for $54.4 million at an average cost of $55.77 per share.

As of March 31, 2015, total assets were $11.0 billion, shareholders' equity was $3.9 billion and the Company's debt to total capital ratio was 18.4%.

45.     In the April 28, 2015 announcement, Defendant Williams, HCC's CEO, reported that the Company was experiencing growth and record first quarter results, and stated:

> "For the third consecutive year, we are pleased to report record first quarter results. Despite a challenging market, we continue to grow our businesses selectively and profitably, with net written premium up 13% overall and 4% excluding ProAg. We are pleased with ProAg's results, which are slightly ahead of our expectations."

46.     Earlier, on February 10, 2015, the Company issued a press release entitled "HCC Insurance Holdings Reports Record Earnings for 2014," further describing the growing success and potential of the Company.  That press release stated, in relevant part:

**Highlights:**

- **Net earnings of $458.3 million, or $4.61 per diluted share, for the full year**
- **Return on equity of 12.1% and operating return on equity[(a)] of 11.0% for the full year**
- **GAAP combined ratio of 81.9% for the fourth quarter and 82.1% for the full year**
- **Gross written premium increased 3% to $691.4 million in the fourth quarter and 4% to $3.0 billion for the full year**
- **Book value per share increased 10% for the full year to $40.44**

HOUSTON, Feb. 10, 2015 (GLOBE NEWSWIRE) -- **HCC Insurance Holdings, Inc.** (NYSE:HCC) today released results for the fourth quarter and full year of 2014.

Net earnings were $113.0 million, or $1.16 per diluted share, in the fourth quarter of 2014, compared to $115.0 million, or $1.14 per diluted share, in the same quarter of 2013. Net earnings were $458.3 million, or $4.61 per diluted share, in 2014, versus $407.2 million, or $4.04 per diluted share, in 2013.

The Company's combined ratio was 81.9% for the fourth quarter of 2014, compared to 81.2% for the same quarter of 2013. The combined ratio was 82.1% for 2014, versus 83.4% for 2013. The net paid loss ratio was 58.7% for 2014, compared to 56.5% for 2013.

HCC had net favorable loss development of $25.7 million in the fourth quarter of 2014, compared to $34.1 million in the same quarter of 2013, and $56.4 million for the full year of 2014, versus $73.7 million in the same period of 2013.

The Company's 2014 accident year net loss ratio was 57.8% and its 2014 accident year combined ratio was 84.4%. These ratios include 1.1 percentage points for catastrophes.

The 2014 results included accident year pretax net catastrophe losses of $12.1 million and $26.4 million in the fourth quarter and full year, respectively, which reduced net earnings by $0.08 and $0.18 per share in the respective periods. The 2013 results included pretax net catastrophe losses of $7.5 million and $52.0 million in the fourth quarter and full year, respectively, which reduced net earnings by $0.05 and $0.34 per share in the respective periods.

Gross written premium increased 3% to $691.4 million in the fourth quarter of 2014, compared to $671.7 million in the same quarter of 2013. Net written premium increased 5% to $550.9 million in the fourth quarter of 2014, versus $525.4 million in the same quarter of 2013. Net earned premium increased 7% to $601.8 million in the fourth quarter of 2014, compared to $560.0 million in the same quarter of 2013.

For the full year of 2014, compared to 2013, gross written premium increased 4% to $3.0 billion; net written premium increased 5% to $2.4 billion; and net earned premium increased 4% to $2.3 billion.

Investment income was $54.1 million in the fourth quarter of 2014, compared to $54.5 million in the same quarter of 2013, and increased to $221.6 million in the full year of 2014, versus $220.2 million in the same period of 2013. As of December 31, 2014, HCC's fixed maturity securities portfolio had an average rating of AA, a duration of 4.7 years and an average long-term tax equivalent yield of 4.3%.

HCC generated cash flow from operations of $478.6 million in 2014, compared to $262.7 million in 2013. The Company's cash flow was decreased by U.S. Surety collateral repayments of $20.3 million in 2014 and $121.7 million in 2013. At December 31, 2014, the Company had $360.3 million of cash and short-term investments and $294.1 million of available capacity under its $825.0 million revolving loan facility.

The Company purchased 4.7 million shares of its common stock during 2014 for $224.7 million at an average cost of $47.70 per share.

As of December 31, 2014, total assets were $10.7 billion, shareholders' equity was $3.9 billion and the Company's debt to total capital ratio was 17.4%.

47.     In the February 10, 2015 press release, Defendant Williams stated:

"The diversity of our businesses and the strength of our underwriting operations combined to generate the third consecutive year of record earnings for our

shareholders. We continue to grow profitably and expect to find new opportunities for growth in the coming year as merger and acquisition activity heats up. We remain nimble, opportunistic and well-positioned for another strong year in 2015."

**The Flawed Process that Lead to the Merger Agreement**

48.     The June 10, 2015 Merger Agreement is the result of a flawed and unfair process by the Board of HCC in which the Individual Defendants breached their fiduciary duties to the Company and its shareholders.

49.     The Preliminary Proxy states that in late June 2014, Defendant Williams received an unsolicited phone call from an executive officer of a large insurance company, which the Preliminary Proxy only refers to as Party A, regarding Party's interest in meeting with Defendant Williams to discuss their respective businesses.

50.     On July 10, 2014, Defendant Williams and the executive officer of Party A met and the executive officer expressed an interest in the possibility of the two companies engaging in a strategic transaction.  No proposal for the Company was made and there was no indication that such proposal would be made.

51.     Between July 10, 2014 and May 5, 2015, Defendant Williams and/or other senior executives and directors met or conference called over six times with Party A to discuss a possible strategic transaction.  These conversations culminated with the executive officer of Party A informing Defendant Williams that any proposal from Party A to acquire the Company would not likely be greater than $60.00 per share.  Defendant Williams indicated it would be unlikely that the Company's Board would find such a proposal sufficiently attractive.

52.     Defendant Williams relayed this information to the Board but made no further efforts to obtain a higher value from Party A, even after the Company received a higher offer from Tokio Marine on May 4, 2015, to acquire all outstanding shares of the Company for $76.00

per share.  Upon information and belief, Defendant Williams only informed the rest of the Board about Party A's offer after any potential deal with Party A was dead because Defendant Williams had communicated to Party A that the Board was unlikely to find the $60.00 per share proposal unattractive.

53.     The Preliminary Proxy further states that on August 1, 2014, Defendant Williams had a telephone conversation with the CEO of a company that operates in the insurance industry. The Preliminary Proxy refers to this company as the Acquisition Target.

54.     Between August 20, 2014 and September 23, 2014, the Company's management engaged with representatives of the Acquisition Target to discuss the parameters of a potential business combination transaction between the Company and the Acquisition Target.

55.     On September 23, 2014, the Company's Board held a special meeting to consider, *inter alia*, a potential business combination transaction with the Acquisition Target.  At that meeting, representatives of the Company's financial advisers reviewed with the Board their financial analyses of the Company and the Acquisition Target.  Also, representatives of the Company's legal adviser reviewed with the Board their fiduciary duties relating to any proposed transaction involving the Company and the Acquisition Target.  The Board then determined to defer the pursuit of a business combination transaction with the Acquisition Target, but no further information is provided as to how that determination was made.

56.     In January 2015, Defendants Rosholt and Williams discussed with representatives of Goldman Sachs the benefit of having informal discussions with other companies that operated in the insurance industry and who have large market capitalizations, to learn about such companies' businesses and strategic objectives.  There is no indication in the Proxy that the

Board was informed of, let alone approved or participated in, the decision to authorize Goldman Sachs to seek a buyer for the Company.

57.     Later, in January 2015, after being authorized by Defendants Rosholt and Williams, representatives of Goldman Sachs approached a few companies that operate in the insurance industry in Japan to inquire whether any of them would be interested in having an introductory meeting with Defendant Williams.

58.     After being approached by representatives of Goldman Sachs, Tokio Marine representatives indicated that they would be interested meeting with Defendant Williams.

59.     No information is provided as to how Japan was selected for meetings with insurance companies there or whether other countries were examined in order to arrange meetings with companies located in those places.

60.     The Preliminary Proxy also fails to disclose which other companies were contacted by Goldman Sach and expressed an interest in meeting Defendant Williams, as well as any information concerning the outcomes of those meetings.

61.     On February 3, 2015, Defendant Williams had an introductory meeting with representatives from Tokio Marine to discuss aspects of the two companies' respective businesses.  The Tokio Marine representatives expressed a desire to continue discussions with Defendant Williams, but no proposal for the Company was made.

62.     Upon information and belief, the Board was not informed of Defendant Williams' above described meeting with Tokio Marine.

63.     On February 27, 2015, Defendant Williams and representatives of Goldman Sachs met with two executive officers of a large insurance company, which the Preliminary Proxy refers to as Party B, to discuss the Company and its business generally.  No further meetings

were held with Party B.  The Preliminary Proxy fails to disclose whether Party B was one of the companies approached by Goldman Sachs, the circumstances surrounding how the meeting was arranged, or the reason(s) why discussions were discontinued.

64.     Defendant Williams continued discussions with representatives from Tokio Marine over the course of March and April 2015.  The Proxy fails to disclose the dates or content of these discussions which resulted in an offer from Tokio Marine for the purchase of the Company.

65.     Upon information and belief, the Board was not informed of, and in no way participated in or contributed to, the above-described communications between Defendant Williams and Tokio Marine.

66.     On May 4, 2015, Defendant William received a letter from Kunihiko Fujii, the senior managing director of Tokio Marine, setting forth a non-binding indication of interest by Tokio Marine to acquire, through a merger transaction, all of the outstanding shares of the Company for $76.00 per share in cash.  The letter further stated that Tokio Marine was willing to work expeditiously toward executing a definitive agreement, but only if the Company would agree to certain conditions, including entering into a nondisclosure agreement and an exclusivity agreement.  Tokio Marine also stated its desire to remain intact but would establish appropriate management retention and multi-year compensation plans for the benefit of the Company's employees.

67.     Later on May 4, 2015, Defendant Williams contacted Mr. Fujii and stated that certain of the assumptions made by Tokio Marine may have been based on outdated information, and asked whether, if updated information were taken into account, Tokio Marine's proposal price would be increased from the $76.00 per share noted in the letter.

68.     The Preliminary Proxy fails to disclose the faulty assumptions and the updated information used to correct the financial disclosures made to Tokio Marine upon which Tokio Marine's proposal was made.

69.     That same day, Defendant Williams followed up with Party A about Party A's interest in a strategic transaction with the Company.  Party A indicated that it was unwilling to offer a price higher than $60.00 per share for the Company.  However, the Preliminary Proxy fails to disclose whether Party A was provided with the updated information that Tokio Marine received.  The Preliminary Proxy also does not describe whether Party A was informed of the competing offer by Tokio Marine or whether Defendant Williams attempted to drive up the price of either Party A or Tokio Marine by initiating a competitive bidding process for the Company.

70.     On May 6, 2015, Tokio Marine sent another letter to Defendant Williams indicating that, based on the updated information, Tokio Marine was willing to increase its proposal to acquire the Company to $77.50 per share.

71.     On May 7, 2015, a special meeting of the Board was held and Defendant Williams updated the Board regarding the revised offer from Tokio Marine as well as Party A's oral indication of interest that was potentially around $60.00 per share.  The Preliminary Proxy fails to disclose whether Party A was apprised of the increased offer made to the Company or whether Party A was privy to the updated information in order to potentially make an alternative competing offer for the Company.

72.     At this time, the Board decided to create an *ad hoc* committee, called the transaction committee, to review, analyze and negotiate the terms of any potential transaction with Tokio Marine.  The transaction committee contained Defendants Bramanti, Molbeck, Rosholt, and Thomas.  The Preliminary Proxy does not disclose the reasons for establishing the

transaction committee or why, after months of negotiations for potential deals involving the Company, Defendant Williams was no longer included on such committee.

73. After further discussions, on May 8, 2015, Tokio Marine increased its offer to $78.00 per share and indicated that the merger consideration would not be increased any further. The Preliminary Proxy again fails to disclose whether Party A was made aware of the increased offer and, if it was not made aware, why the transaction committee and/or Defendant Williams did not attempt to drive up the price by informing Party A of the definitive offer from Tokio Marine.

74. On May 9, 2015, the Company entered into a nondisclosure agreement and exclusivity agreement with Tokio Marine. There is no information provided whether Party A was made aware of these agreements or whether any attempt was made to negotiate further with Party A prior to entering into the agreements in an effort to receive a competing offer.

75. The Company and Tokio Marine entered into the Merger Agreement on June 10, 2015.

**Terms of the Proposed Merger**

76. On June 10, 2015, HCC issued a press release announcing that the Company had entered into a Definitive Merger Agreement with Tokio Marine, with the subtitle, "Tokio Marine Holdings to Acquire HCC Insurance Holdings in $7.5 Billion Transaction." The press release stated in part:

> TOKYO and HOUSTON, June 10, 2015 (GLOBE NEWSWIRE) -- Tokio Marine Holdings, Inc. (TMHD) and HCC Insurance Holdings, Inc. (HCC) (NYSE:HCC) today announced that they have entered into a definitive agreement under which TMHD will acquire all outstanding shares of HCC, a U.S. insurance holding company comprising property & casualty, accident & health and other specialty insurance businesses, for $78.00 in cash per share, through TMHD's wholly owned subsidiary, Tokio Marine & Nichido Fire Insurance Co., Ltd. (TMNF). The acquisition price of $78.00 per share represents a 35.8% premium to HCC's

average share price over the past one month and a 37.6% premium to the share price as of close of business on June 9, 2015. The total transaction value is approximately $7.5 billion, and the transaction is expected to close in the fourth quarter of 2015.

*     *     *

**Certain Transaction Terms:**

Under the terms of the agreement, Tokio Marine will acquire 100% of the shares of HCC for $78.00 in cash per share. HCC is permitted to continue to pay regular quarterly cash dividends of up to $0.295 per share, per quarter, until the transaction closes. The acquisition will be financed through the utilization of Tokio Marine's cash on hand together with borrowings. The consummation of the transaction is not subject to any financing condition

**Approvals and Timing:**

The Board of Directors of TMHD and the Board of Directors of HCC have unanimously approved the transaction. The acquisition is subject to the approval of HCC's shareholders and the approval of various regulatory authorities, as well as other customary closing conditions. The transaction is expected to close in the fourth quarter of 2015.

Credit Suisse and Evercore acted as financial advisors to Tokio Marine in this transaction and Sullivan & Cromwell LLP provided external legal counsel. Goldman Sachs acted as financial advisor to HCC and Willkie Farr & Gallagher LLP provided external legal counsel.

77.     Under the terms of the Merger Agreement, Merger Sub will merge with and into the Company with the Company continuing as the surviving corporation in the merger and an indirect wholly-owned subsidiary of Tokio Marine (the "Merger").  As a result of the merger, the separate corporate existence of Merger Sub will cease.  Upon completion of the Proposed Merger, shares of the Company's common stock will no longer be listed on any stock exchange or quotation system.  At the effective time, Tokio Marine will become the sole owner of HCC and its business.

78.     Pursuant to the Merger Agreement, HCC shareholders will receive $78 in cash per share, through TMNF.  The acquisition price of $78 per share represents a 35.8% premium to

HCC's average share price over the past one month and a 37.6% premium to the share price as of close of business on June 9, 2015.  The total transaction value is approximately $7.5 billion, and the transaction is expected to close in the fourth quarter of 2015.

79.     In addition, under the Merger Agreement, HCC will not be permitted to solicit superior proposals from third parties at all and, in the event a third party submits a proposal, the Board must provide notice and details of the proposal to Tokio Marine.

80.     Credit Suisee and Evercore are the financial advisors to Tokio Marine and Sullivan & Cromwell LLP provided external legal counsel

81.     Goldman Sachs acted as financial advisor to HCC and Willkie Farr & Gallagher LLP provided external legal counsel to the Company.

82.     The Proposed Merger serves no legitimate business purpose of HCC but rather is an attempt by Defendants to enable Tokio Marine to benefit unfairly from the transaction at the expense of HCC's public shareholders.  The Proposed Merger will, for a grossly inadequate consideration, deny Plaintiff and the other shareholders of the Company their right to share proportionately in the future success of HCC and its valuable assets, while permitting HCC to reap huge benefits from the transaction.

83.     Furthermore, the Individual Defendants agreed to onerous deal protection devices in beach of their fiduciary duties to HCC shareholders, which prevent a superior offer from being made for the Company.  Specifically, Defendants agreed to: (i) a provision that requires the Company to pay Tokio Marine a termination fee of $187,500,000; (ii) a no-solicitation provision that prevents other buyers from having access to the Company's confidential information, which information is necessary to formulate a bid; (iii) a "no-shop" provision prohibiting the Company from actively soliciting potential bidders; and (iv) an agreement to promptly (within two

business days) notify Tokio Marine of any other Takeover Proposal from a third party to HCC. These provisions substantially limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of HCC.

84.     In agreeing to the Merger Agreement prior to adequately shopping the Company, the Individual Defendants have breached their fiduciary obligations.

85.     The terms of the Merger Agreement are structured to ensure that Tokio Marine, and only Tokio Marine, ultimately acquires HCC, regardless of whether such terms are designed and/or serve to maximize shareholder value.

86.     The Termination Fee and expense obligation are deterrent to other potential bids and provides Defendants with an unearned windfall at the expense of the Company's public shareholders if a superior bid emerges.

87.     Accordingly, the terms of the Merger Agreement substantially limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of HCC.

88.     By virtue of their positions as directors and senior officers of the Company, the Individual Defendants have access to and knowledge of HCC's internal financial information, which reveals the true financial and operating condition and prospects of the Company, and have shared such information with Tokio Marine.  Defendants are using this information to benefit themselves at the expense and to the detriment of HCC and the public shareholders.

89.     The Individual Defendants' actions in proceeding with the Proposed Merger are wrongful, unfair and harmful to HCC's public stockholders, and will deny them their right to share proportionately in the true value of HCC's valuable assets, profitable business, and future growth in profits and earnings.  The Individual Defendants have breached their fiduciary duties

to HCC shareholders and failed to maximize shareholder value by causing the Company to enter into the Merger Agreement that provides for the sale of HCC at an inadequate price, and deprives HCC's public shareholders of maximum value to which they are entitled.

**The Merger Agreement's "Golden Parachute" Provision Makes Defendant Williams and the Management Team Conflicted**

90.      The Proposed Transaction is dominated and controlled by interested management members and Defendant Williams.  Defendant Williams and the other management members, including Brad T. Irick, William N. Burke and Michael J. Schell, who negotiated the sale, have a personal interest in selling the Company for any price, since a sale will result in substantial change-in-control payments to them.  Defendant Williams has fiduciary duties to the Company and its shareholders to obtain a price that is fair through an unflawed process and represents the true value of the Company.

91.      Specifically, in the event of a sale: Defendant Williams will receive consideration in the amount of $26,105,924; Brad T. Irick, Executive Vice President and Chief Financial Officer ("CFO"), will receive total compensation in the amount of $5,891,446; William N. Burke, President and Chief Operating Officer ("COO") will receive total compensation in the amount of $8,166,740; and Michael J. Schell, Executive Vice President, will receive total compensation in the amount of $4,436,798.

92.      By agreeing to the Merger Agreement, Defendant Williams stands to gain substantially from the Proposed Transaction, as well as the rest of the management team, by virtue of the "Golden Parachute" provisions entitling Defendant Williams and the management team to millions of dollars in change-in-control compensation.  As such, Defendant Williams and the management team are conflicted because the sale of the Company, for any price, will provide these individuals with significant compensation.

**The False and Misleading Preliminary Proxy Statement Concerning
the Background of the Merger**

93.    On July 13, 2015, the Company filed a Preliminary Schedule 14A Proxy
Statement (the "Preliminary Proxy") with the SEC providing information leading up to the
Company's entry into the Merger Agreement.   The Preliminary Proxy contains false and
misleading information and/or fails to disclose material information needed for shareholders of
the Company to make an informed decision concerning the Proposed Merger.

94.    The Preliminary Proxy contains a material false statement concerning the
background of the merger necessary for shareholders to make a fully informed decision
regarding the Proposed Merger.   The Preliminary Proxy falsely states, "[s]et forth below is a
description of the material aspects of the background and history behind the merger."   This
statement is false in that the Preliminary Proxy omits numerous facts relating to the background
and history of the merger required for shareholders to be fully informed of all material aspects of
the Proposed Transaction, as detailed below.   The false and misleading Preliminary Proxy is a
breach of the Individual Defendants' fiduciary duties.

95.    Among other material information, the Preliminary Proxy is false and/or
misleading or fails to disclose material aspects of the Proposed Transaction, including:

a.    The identity of Party A and the executive officer Defendant Williams
remained in contact with throughout the process leading up to the Merger
Agreement;

b.    Whether Party A had a previous relationship with the Company or any of
its Board members;

c.    Details concerning Party A's oral expression of $60.00 per share offer for
the Company;

d.      Whether the updated information received by Tokio Marine was also given to Party A;

e.      Whether Defendant Williams informed Party A of the alternative offer of $78.00 per share it received from Tokio Marine;

f.      The identity of the Acquisition Target and why the Board decided to defer any potential business combination transaction or any transaction at all with the Acquisition Target;

g.      Whether Defendant Williams had a previous relationship with the Acquisition Target or the CEO that initiated the conversation with Defendant Williams on August 1, 2014;

h.      The number of companies approached by Goldman Sachs to inquire whether any of them would be interested in having an introductory meeting with Defendant Williams;

i.      The identities of the companies Goldman Sachs approached in the insurance industry;

j.      Whether Goldman Sachs approached any companies outside of Japan and, if not, the reasons for limiting the search to Japan;

k.      Whether Defendant Williams or the Company had any previous relationship with Tokio Marine, Kenji Okada and Kunihiko Fujii;

l.      The identity of Party B and how the meeting with representatives from Party B and Defendant Williams came about;

m.      Whether any information was provided to Party A or if Party A asked for Company information in order to make a formal offer;

n.    The information provided by Goldman Sachs to the Company's Board on March 5, 2015, in its presentation;

o.    Information regarding whether the Board received or reviewed any other strategic alternatives;

p.    The reason why the Board created the transaction committee and how it determined who should comprise the transaction committee;

q.    The reports provided to Tokio Marine on April 29, 2015, in order for Tokio Marine to estimate the benefits of possibly acquiring the Company;

r.    The limits on the transaction committee's authority and its ability to negotiate possible transactions involving the Company;

s.    What the outdated information and/or assumptions were that Tokio Marine initially used in its first offer of $76.00 per share;

t.    Whether the same information was relied upon by Party A or whether Party A was provided any information at all to make an offer;

u.    Whether Party A was informed of the exclusivity agreement entered into between HCC and Tokio Marine;

v.    Information concerning HCC's retention of Goldman Sachs and when this occurred; and

w.    Whether HCC hired other financial advisers and how the decision to hire Goldman Sachs was made.

**The False and Misleading Statements Concerning Goldman Sachs'**
**Financial Analysis**

96.     The July 13, 2015 Preliminary Proxy contains false and misleading statements and fails to disclose material information such that shareholders are deprived of making an informed decision regarding the Proposed Merger.

97.     The Preliminary Proxy fails to disclose the fees paid to Goldman Sachs during the two year period ended June 10, 2015, and fails to disclose key inputs and assumptions underlying the analyses in the Goldman Sachs' fairness opinion including material information concerning Goldman Sachs' *Selected Companies Analysis*, such as the objective selection criteria, other multiples examined and the observed company-by-company pricing multiples and financial metrics examined by Goldman Sachs, and the methods used by Goldman Sachs to assess the fairness of the offer.

98.     The Preliminary Proxy fails to disclose material information concerning Goldman Sachs' *Illustrative Dividend Discount Model Analysis*, such as the identity, quantity, and source of the cost-of-equity assumptions; and the implied pricing multiples corresponding to the assumed growth rates.

99.     The Preliminary Proxy fails to disclose material information concerning Goldman Sachs' *Illustrative Present Value of Future Stock Price Analysis*, including the reason for the low range of P/E multiples selected by Goldman Sachs.

100.     The Preliminary Proxy fails to disclose material information concerning Goldman Sachs' *Precedent Transactions Analysis*, including (i) the objective selection criteria; (ii) the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics examined by Goldman Sachs; (iii) other multiples that were examined; and (iv) the reason for the low range of P/TBV multiples selected by Goldman Sachs.

## INJUNCTIVE RELIEF

101.    Plaintiff seeks preliminary and permanent injunctive relief and declaratory relief preventing Defendants from inequitably and unlawfully depriving Plaintiff and other public shareholders of HCC of their rights to realize a full and fair value for their stock at a premium over-the-market price and to compel Defendants to carry out their fiduciary duties of good faith and loyalty.

102.    Only through the exercise of this Court's equitable powers can the Company and the public shareholders of HCC (including Plaintiff) be fully protected from the immediate and irreparable injury, which Defendants' actions threaten to inflict.

103.    Unless enjoined by the Court, Defendants will continue to breach their fiduciary duties owed to Plaintiff and the other public shareholders of HCC and will not only prevent the sale of HCC at a substantial premium, but will facilitate the sale at an unfair price to a pre-ordained buyer, all to the irreparable harm of HCC and its public shareholders.

104.    Plaintiff has no adequate remedy at law.

## FIRST CAUSE OF ACTION
### Brought as a Class Against the Individual Defendants and HCC for
### Violation of § 14(a) of the Exchange Act of 1934, as amended, 15 U.S.C. § 78n(a)

105.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

106.    The Individual Defendants and HCC have caused the Preliminary Proxy to be issued with material omissions and false and misleading statements as detailed above.

107.    The Preliminary Proxy is an essential link in the accomplishment of the Proposed Merger.

108.     In the exercise of reasonable care, the Individual Defendants and HCC should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

109.     The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the vote by shareholders.

110.     HCC will, if the Proposed Merger is consummated, be deprived of the opportunity for substantial gains, which the Company may realize.

111.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other HCC public stockholders.

112.     As a result of the actions of Defendants, Plaintiff and the other shareholders of the Company have been and will be damaged in that they have not and will not receive their fair proportion of the value of HCC's assets and business and will be prevented from obtaining appropriate consideration for their shares of HCC common stock.

113.     Unless enjoined by this Court, Defendants will continue to breach their fiduciary duties owed to Plaintiff and the other shareholders of the Company, and may consummate the Proposed Merger, which will exclude the Class from its fair proportionate share of HCC's valuable assets and businesses, all to the irreparable harm of the Class, as aforesaid.

114.     Plaintiff and the other shareholders of the Company have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the other

shareholders of the Company be fully protected from the immediate and irreparable injury, which Defendants' actions threaten to inflict.

115.    Plaintiffs have no adequate remedy at law.

## SECOND CAUSE OF ACTION
**(Brought as a Class Against the Individual Defendants for Violation of Section 20(a))**

116.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

117.    The Individual Defendants acted as controlling persons of HCC within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of HCC and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Preliminary Proxy, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

118.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Preliminary Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  In addition, as the Preliminary Proxy sets forth at length, and as described herein, the Individual Defendants were all involved in negotiating, reviewing and approving the Proposed Merger.  The Preliminary Proxy purports to

describe the various issues and information that they reviewed and considered, descriptions which must have had input from the Individual Defendants.  The preliminary Proxy at issue contains the recommendation of all the Individual Defendants to approve the Proposed Merger. They were thus directly involved in the making of these documents.

120.    By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the 1934 Act.

121.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants' conduct, HCC and its shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in its favor and in the favor of HCC and other shareholders of the Company against Defendants as follows:

A.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Merger, unless and until the Company corrects the alleged material omissions and false and misleading statements in its Preliminary Proxy;

B.    Awarding Plaintiffs compensatory and statutory damages;

C.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and experts' fees; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

DATED:  August 21, 2015.

Respectfully submitted,


_____/s/ Thomas E. Bilek_____
Thomas E. Bilek
TX Bar 02313525 / SDTX Bar 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, Texas  77002
(713) 227-7720

*Counsel for Plaintiffs*

**OF COUNSEL:**

Edward Miller
Joshua Lifshitz
**LIFSHITZ & MILLER**
821 Franklin Avenue, Suite 209
Garden City, New York  11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376